Dr. Sari Edelman v. NYU Langone, 24251 Good morning. May it please the court, my name is Joseph Labuda and I represent the appellant Dr. Sari Edelman. There are two main issues on appeal before this court. The first is the jury's verdict in favor of Dr. Edelman on her retaliation claim, which was overturned by the lower court pursuant to Rule 50. Second is the plaintiff's federal and state EPA claim. I'm going to start with the retaliation claim. On retaliation, the jury's verdict in favor of Dr. Edelman was based on ample evidence and should never have been overturned by the lower court, which held that Dr. Edelman failed to establish a prima facie claim of retaliation, which as the court knows is a minimal burden. Moreover, it must be remembered that because the jury found in favor of Dr. Edelman, the standard is a complete lack of evidence supporting the jury's verdict. In other words, in order for the lower court order to stand, there is absolutely no path forward for the jury to conclude that Dr. Edelman established a retaliation claim in viewing the facts most favorable to Dr. Edelman. The difficulty in this case, it seems to me, is that the dispute over the office between Antonick and Edelman was elevated in such a way that it's quite clear that Antonick didn't care much for Edelman. It turns out that there was a lot of reasons why that might be, which we need not to get into now. But that's really beside the point. The question is, was he aware that she had filed a report not saying that there was a dispute, not saying that he was abusive, not saying that he acted inappropriately, but that he was discriminating against her? And that's the real question on the basis of sex. Well, so first off, the issue of Didn't the district judge say that that's really the problem in this retaliation case, is that the dispute was because he was discriminating against her on the basis of sex, not because he was discriminating or acting against her on the basis of the fact that she was obstreperous or that she created a difficult environment to work in because of the way she was behaving. All of that, retaliation on that basis, is, you know, would put us into the position of being a human rights department, a human rights department in a firm, which we're not. We're looking solely at the discrimination on the basis of sex. So, Your Honor, with respect to the knowledge aspect, this Court has repeatedly said, and it said in the Kwan v. Andelix case, that all that is needed to establish the knowledge element on a prime facie case is corporate knowledge, general corporate knowledge. In fact, Andelix went on to say Let's be a little more specific than that. Who in the corporation had knowledge? All that's required for the knowledge element, all that is required is general corporate knowledge. In fact, in the Andelix General corporate knowledge doesn't sit out there in the air. It has to be based upon somebody in the corporation with knowledge. Oh, absolutely. In the Andelix case, which I think is instructive. The Andelix case, the Kwan case is instructive. Counsel, it's Pacino, right? Pacino. Let's answer Judge Walker's question. So, I promise you that we are asking questions because we want the answers. Yes, yes. So let's talk about, if you want to go to, there's imputed general knowledge, great, but tell us who had it and how that's imputed. So then it jumps into the causation, which is in terms of, I think, what Judge Walker was talking about. But this Court has said repeatedly, Summa, Pacino, Gordon, Gorman-Bacos says that you don't have to establish knowledge for the causation element. In fact, I think But even Don't you have to have knowledge if there was a law file? For the last element, which is the causation, there needs to be some type of causal connection between the protected activity and the adverse action. And this Court has said in all those cases I mentioned that the jury can infer a causal connection through temporal proximity between the protected activity and the adverse action or because of disparate treatment. And the protected activity. And you have both in this instance. This Court focused on the extent to which all the activity that occurred between these three actors, if you will, Pacino, Edelman, and I guess it was Kaplan as well. All of that activity was a report made by Edelman of a kerfuffle that was very difficult and abuse that she felt and maybe even that it was directed at her sex. But a specific report of sexual discrimination there. And the district court found no evidence of that. And I know this is disputed by you. And a lot of it has to do with, well, was, how was it tried? And was it was it was was Edelman's position made explicit in the dispute between in the on the record about the report? And but but but the district judge did not concentrate on the true causation point. And I don't think anybody argued that really specifically. The district court really focused on retaliatory intent and just whether or not Antoinette knew. And I think the court the lower court erred on that, because, again, this court has repeatedly said you don't necessarily have to have that knowledge in order for the jury to infer to infer that there was a that there was a causation between the two. All that they're saying is that if she complained on Monday and on Tuesday she got fired, the jury could reasonably infer just based on that minimal temporal proximity that one has to do with that. That's that's an unroboted inference, an unroboted presumption that exists. But but it can be rebutted. It can be. There can be evidence. The fact the fact that she was fired separately because suppose suppose she had a dispute with somebody in her boss and in the banking in a banking situation as a dispute with her boss. But but somebody else in the human rights and the human relations department fires her for other reasons. And there's no connection between the two. That's and it doesn't the next day. Then there's no case. So, Your Honor, I mean, again, the court has said temporal proximity, disparate treatment. Both of them are here the way that she was treated and targeted multiple ways. And in fact, in this case, there's evidence that when Dr. Edelman complained to Pachino multiple times, there's e-mails. It's not only September 16th, but September 5th and November 1 about all this conduct that she did speak with Antonin. Antonin may deny it, but the Quan case says it doesn't matter whether or not that person denied it. But nothing went back to Antonin after the first contact with Pachino, right? Antonin had had the contact with Pachino. And later on, he learns that she's claiming retaliation on basis of sex. Well, I think the evidence is that the complaint on September 16th, the verbal one, as well as the one, the e-mail on September 25th, as well as the one on November 1st. And there's also a reasonable inference that the jury could take that an HR person, whose job it is to investigate these types of claims, would then subsequently talk to these individuals. And it wasn't just Antonin. It was also she was complaining about Kaplan. And she complained to Jos Forno, who was right below Rubin. All of these people testified, but the evidence wasn't explicit, it seems to me. Isn't that what the district court found here? The district court improperly made credibility determinations that ultimately there was that credited Antonin's testimony. Between the plaintiff and Mr. Antonin. But that's not the issue. The issue is when did Antonin understand that this was a protected activity on the basis of sex? The jury could easily find that that happened on September 17th, which is the day that he refused to give her, expand her office hours. And it's only two months after he started a log on her that had never existed in six years. Sorry, just to be clear. He starts the log two months after that happens. Correct. Correct. And then sends the e-mail on November 6th of the following year, right before her contract is up, saying we need clear and convincing evidence of her bad acts. But how does that tie in? To retaliation on the basis of the fact that she's a troublemaker, as opposed to retaliation on the basis of sex. I would not disagree with Your Honor that that would be a plausible determination that the jury could make. Okay. I'm not disagreeing with that. That was NYU's argument, was that she's just a troublemaker and that's all Antonin knew. The jury rejected that wholeheartedly. And they said we don't believe that it was just because of this office dispute. People don't get fired over an office dispute. They get fired because they're raising issues of sex discrimination. Well, and then we have to look at exactly how she raised them and how that, and the extent to which he was aware of, Antonin was aware of that. Right? Antonin's knowledge. This Court in this University's case said, when they were talking about the knowledge of the decisionmaker, says, and I quote, to the extent that that decisionmaker knowledge is relevant in establishing causation. They say relevant. They don't say necessary at all. Let's talk about the knowledge, though, because here's what the jury heard. The jury heard Dr. Edelman testify that her first complaint, which was a verbal complaint by phone, shortly or immediately after her first encounter with Antonin, she expressly said she testifies, I felt it was a sexist, discriminatory, chauvinistic attack that needed to be addressed with HR. She talked to Pacina for, quote, 20 or 30 minutes. There was a case number assigned, and she said she'd get back to me. Pacina then testifies that she spoke the next day or that day with Mr. Antonin about the issue. Wouldn't a reasonable jury, wouldn't it be fair for a reasonable jury to infer that Pacina conveyed the content of what she discussed with her? Absolutely. Absolutely. Do you have an argument that knowledge exists, although it sounds like you have an alternative argument that you keep returning to, that knowledge isn't necessary. But do you also have an argument that knowledge was, that there was enough evidence there for a jury to infer knowledge? There's enough evidence to infer that Antonin had knowledge about the sex-based complaint, because HR's role is to investigate claims. Pacina was specifically told everything that happened, that would include the use of the B word, and that she was complaining about sexist behavior by Antonin. That's reasonable for the jury to infer that that complaint that was made that day was passed on to Antonin, despite his denial. They just rejected his denial. Well, that's true. If you leave out the whole notes question, the district court relied upon the notes, the thorough notes that Pacina took. And your adversary said she wrote, your client said she wrote everything down. And there wasn't much in the notes other than a dispute over the office space and the waving of hands and the difficulties of that meeting, without any reference in the notes to anything sexual. Those notes are dated in March of 2020. This complaint was in September of 2019, first of all. But there's also evidence in the record that they were contemporaneous. It's not quite clear why it was on the site. The jury could reasonably – again, every inference has to be given to the plaintiff in this case, and they could reject that and say these notes are not contemporaneous, they don't contain everything that was said, especially since, again, this Court has to accept that every inference in favor of a plaintiff, which is that she complained about sex discrimination, she complained about Antonick's sexist behavior and calling her the B word, and that that was passed on to Antonick through the conversation the very next day. Now, I just want to be very clear about this. Are you relying solely or just in part on the cat's claw theory? I would say that, in fact, the cat's claw theory, because of Antonick's position, okay, as the office manager there, along with Kaplan, you know, who was dismissed. You know, we have an issue with him as well. But because of – and their integral involvement in the termination, including the November 6, 2020, email where they say we need this evidence, we need this clear and convincing evidence that the – Which would be consistent with either theory. Correct. We think – And they were not programmative of any particular – We think that they assisted. They weren't manipulating, necessarily, Rubin, but they assisted him in gathering information that led ultimately to her termination. So we don't think that cat's claw necessarily has to apply, but even if it does. If, as you say, there's not so much manipulation, but they collected the information, and Rubin collects the information, and a year later, on the basis of that information, lets her go, doesn't renew her, that that itself is sufficient for causation? That would be enough for causation, simply because, again, you've got issues. In terms of the causation aspect of things. Doesn't the cat's claw theory fail under those circumstances where there's no manipulation? No. Well, first off, I think there would be manipulation by the part of Antonek. Assuming, let's say, cat's claw applied, the manipulation was by Antonek and by Kaplan in terms of targeting and ginning up this information about Dr. Edelman. That's the part. And then there was no follow-up. There was no investigation done. They didn't even talk to Dr. Edelman before they fired her. She had been there for six years, and then they summarily terminated her. And one last thing. There's no, with respect to what Rubin said, Rubin says that, well, it had to do with these blood tests and x-rays, that she was excessive. No evidence whatsoever of the amount that she did. And no comparison between any other doctors. And then, in fact, shortly after she was terminated, he sends an e-mail and says, recommends her to a place in Florida saying that she's a good doctor. So can I just, I need to understand, and I know we've kept you well over time, and we'll let you sit down for a second. Yes. I think I fully understand the theory that she tells HR, HR tells him, he has a retaliatory animus and ultimately translates that into gathering dirt and getting fired. The theory that I still want to make sure I understand how you see it is that NYU, so this wouldn't apply to Antoinette as an individual, but NYU had general corporate knowledge that she had complained of sex discrimination. You still have to have retaliatory animus in order to fill out the elements of retaliation claim. On that theory, do you need the retaliatory animus to come from Antonick, or can it come from Rubin based on time? Like, where is that? I think, you know, it's an interesting question, Your Honor, but I think the retaliatory animus could come from anywhere. You know, all that's required. On your theory, where does it come from? On that theory. However, I mean, you have to look at where the actions are coming from. So, again, you look at that temporal proximity.  Correct. Actually, on this record, where does the retaliatory animus, I'm trying to figure out whether your alternate theory also runs through Antonick or whether it runs through some other individual, or whether there's some ethereal institutional retaliatory animus. Well, I mean, look, so arguably, in a situation like this, you could have where there's multiple complaints of retaliation and discrimination that Dr. Edelman makes, including up to Josh Swernow, who's the right-hand man of Rubin, and she's complaining generally about male chauvinism, how NYU is just a male-dominated place and it puts women down. Okay? So if that complaint gets out and it percolates up to Kaplan, he's part of it, Swernow for sure, and then goes to Rubin, it could just be enough that, look, you know what? We don't want women who are complaining about male chauvinism. I'm interpreting your answer as it doesn't have to run through any identifiable individual. The general corporate knowledge combined with timing or other things is enough to get you retaliatory animus. That's where I think this Court has at. Thank you. Thank you. All right. Well, we'll hear from you again. Okay. Thank you, Your Honor. Mr. Schoenstein. Thank you, Your Honors. Richard Schoenstein with my partner Richard Steer from Tartikrinsky and Drogen for the appellees. So the judge did not overturn the jury verdict. What Judge Lyman did is we made a motion for a judgment as a matter of law at the close of evidence before the case went to the jury, and the judge reserved on that. He didn't issue a ruling. And then after the jury verdict, we renewed the motion as a judgment notwithstanding verdict, and he granted it with a very detailed 48-page opinion and order where he goes through the facts and many of the arguments that we've been discussing so far today and sets forth why on this retaliation claim he didn't find evidence of knowledge of protected activity, any general corporate knowledge of protected activity, and he didn't find that the adverse employment action, which was the non-renewal of her contract a year later, was at all connected. Was there any – you're not claiming any instructional error here, I assume. No. There's no – there's no disputers to the instruction. So essentially, we would have to conclude that the inferences that the district judge didn't find present in the evidence, but that the jury unanimously found present in the evidence, that the jury was simply wrong. Yes. You would have to – you would have to credit and affirm the judge's rulings as to what the evidence was and whether it presented a case sufficient to go to a jury. And, Your Honor, the judge was entirely correct in that regard. Well, no, he wasn't correct. Let me ask a question on that. I'm sorry. Can I – I just want to ask a question on the standard here. The other side has made the point that there was – it's a he-said-she-said situation and the judge picked one side effectively. But my question is, can't – and the judge – that may have been the dynamics of this, but it also might have been that the judge took a look at all of the evidence as a whole and said, based upon that, no reasonable jury could reach the conclusion here of retaliation as alleged, and take into account all of the evidence, not just – not just what the plaintiff was saying, but also what the others were saying, and particularly Pacina and her notes. Because that's a big issue, I think, in this case. Are Pacina's notes – should they play a major role in this case? Because maybe they weren't complete. Well, I think they do play a role. See, I see the case, Your Honor, as a chain, and there are links that have to connect for the chain to get from one end to another. And there's a problem here with every link. Pacina testified adamantly she did not understand this to be a complaint about gender-based discrimination. She understood it to be a complaint about office space and the conduct of an individual. Her notes – But we know that – we know that – I'm sorry. I just want to clarify that. We know that the plaintiff testified that she personally, in the very first call, told Pacina that he talked to her in a sexist, discriminatory – and it was a chauvinist attack, and it needed to be addressed with HR. And so that is her testimony. It's not your position that the district court is free to weigh the credibility of the respective – No, but the court is free to see if there's any evidence of that in NYU's corporate knowledge. Why? Because that's the issue. Did NYU have corporate knowledge that there had been protected activity? Did it infect what Antonick did? And then did what Antonick do in any way infect Rubin's decision? But if we're talking about general corporate knowledge, we then have a string of e-mails that specifically talk about – I mean – Well, let me talk about the string of e-mails. There's an e-mail from HR that's sent to Edelman on November 18th, 2019. I've been informed that you raised some concerns regarding your treatment in the workplace. I'm the new ER manager and will investigate your concerns. Are you available to speak? Dr. Edelman never responds. That's in November of 2019. Dr. Edelman doesn't respond in November, December, January, February. She never raises the issue again. HR reached out to her. So to the extent she had raised an issue, the overwhelming evidence was that NYU thought it had been resolved. She had been given her office full time, which is what the complaint was really about. They want me to share my office two days a week. I don't want to do it. They resolved that in her favor. HR followed up. She ignored it. Pachina's notes said nothing about a gender discrimination complaint. She didn't believe that there was one. There is zero evidence that anybody said to Antonick that there had been a complaint about gender discrimination. There is only supposition that ---- Did you make this argument to the jury? I'm sure I made parts of this argument to the jury. Absolutely.  And they rejected it, right? They presumably concluded that, well, we believe Edelman when she says what she told Pachina. We're not going to accept the notion that because Pachina's notes didn't reflect what Edelman has said, we're going to believe those notes. And so the jury clearly at least got the information to Pachina. And it seems like the jury inferred that it's reasonable, especially given Antonick's acknowledgment that the concern wasn't really about office space at all. It was about the way he talked to her. Well, we don't know exactly what the jury, how they got from A to B. But we do know one thing. We do know one thing, Judge. Just let me finish. Okay. Yeah, yeah. We do get to indulge the inferences from the evidence that are most favorable to the jury, don't we? We don't. Of course. We're not relitigating as if we're the fact finders, nor should the district court do that. Of course. The jury, by the way, did not find Rubin or Swernow liable for retaliation. They cleansed the people who made the decision not to renew the contract. That means there couldn't have been any causation. The jury found that Rubin acted absolutely without any retaliatory animus by finding in his favor. That's why this chain doesn't work. Well, wait a second. Couldn't Rubin have been acting? This could sort of be cat's paw. But if Antonick is out collecting clear and convincing evidence against Dr. Edelman, and he feeds that all to the decision makers, and the decision makers are personally not shown or the jury doesn't agree that they were shown to have known about the gender aspect, couldn't a jury reasonably say, look, I don't think Rubin and Swernow, is that the other one? Yeah. I don't think they knew about that part. But Antonick clearly knows, and NYU is on the hook. Let me talk about cat's paw for a minute, because I do think you would need cat's paw to get to a verdict against NYU or anybody here. The cat's paw analogy is that there's a monkey running around trying to convince a cat to swat chestnuts. It's a very festive holiday image. Swat chestnuts out of a fire. And the cat ends up with a burned paw, and the monkey runs off with the chestnuts. So here Rubin doesn't end up with a burnt paw. He decides not to renew Dr. Edelman's contract because the clinicians, the doctors running his practice So there's no way for a verdict, there was no way for a divided verdict in this case. You would find any verdict that didn't find for all four or against all four subject to I wouldn't go, I don't think I would go that far. I don't, I haven't thought it through to tell you there's no way for a divided verdict, and I'm not basing my argument solely on the fact that the jury didn't find against Rubin. But Rubin was adamant. He made his decision on clinical observations by Dr. Porges and Dr. Goldberg. Antonick had nothing to do with gathering those. Antonick gathered information from Millie Ruiz, an office manager, about stuff that had gone on in the office. And who did Ms. Ruiz talk to about that information? Excuse me? And Ms. Ruiz, when she decided to start collecting that information? Well, she collected, she was collecting the information at some point. I think she testified she collected the rubbers. And where did that impetus come from to do that? Because she said she didn't have spreadsheets on anybody else, right? And she started creating this spreadsheet very late in the game for Dr. Edelman. I don't know if it was late in the game. It was at some point during that year, yes. But wasn't there a testimony that suggested the motivation for that, that we need to hunt down some evidence? Listen, I thought Millie Ruiz was the best witness in the whole case. And I don't see how you could have looked at her and thought she had any motivation of retaliation. No, not that she had motivation. That's someone who's her boss asked her to do something. No, they were motivated by patient complaints, is I think what the evidence was. There were patient complaints about the doctor. That was the, Ms. Ruiz testified that she was motivated by patient complaints? I think she did testify that she was asked to keep a record. That's my question. I think that is true. But that doesn't get you, because those are not the incidents that lead to the non-renewal of the contract. The non-renewal of the contract is decided by Mr. Rubin based on clinical information he gets from Dr. Porges and Dr. Goldberg. Antonick has no role in any of that. So Antonick is not some crazy monkey running around getting this cat to fan chestnuts. Antonick never even speaks to Rubin about this. All he does is forward some of the Ruiz chart to somebody else who includes it in another e-mail of something that ends up going to Rubin. It's way too attenuated. That's where I say there are all these things in the chain. Chain one, link one, did Pacina think there was a complaint about gender discrimination? No. Well, no. Again, you're telling us you're reading the evidence. She testified that she told Pacina that. How can you possibly say no to that? Link two, link two, did she tell Antonick that there was a complaint about gender discrimination? There is zero evidence of that. There is only surmise. Well, did he testify at his deposition that he knew there was something more to it? That doesn't — Well, again, you're building — it's not — I think my concern and I think my colleague's concern comes from a part of you saying nothing. You can say it's not enough, it's too many — too small grains of sand to build this bridge on. Okay. But there's not nothing. All right. Well — In fact, she says in his deposition, the question was you understand that Dr. Edelman's complaint had really nothing to do with office space, correct? Answer from Antonick, correct. He understood it was about his conduct. Her complaint was about the way you spoke to her, right? Correct. I mean, and what was the complaint about his conduct? It said it was sexist and chauvinistic. No, no. The way he spoke to me, that doesn't mean sexist and — that doesn't mean — No. That means loud. That means animated. That doesn't mean sexist. Well, the jury could infer, combined with the fact that we know she's conveyed the complaint to him, that he understands that that means sexist and chauvinist. There's no — but there's no evidence that would get you to him, or very, very, very thin evidence, if you prefer to think of it that way. And even then, you have to get from that to, therefore, he prepared these materials and they somehow swayed Rubin. And that link is — there's no evidence of that, because Antonick doesn't talk to Rubin. That's not what Rubin makes his decision on. And Judge Lyman went through in great detail. You know, plaintiffs argued Antonick must have been aware. They argued eight different reasons Antonick must be aware. Judge Lyman took the time in his opinion. He went through every single one of those and dealt with them. And he was the person who oversaw all of this evidence and the case, and he did the correct thing in granting our motion, our renewed motion.  I think we have your argument. Let me mention something else. He could have sent it back for a new trial if he was going to consider more of the evidence. Just the weight of the evidence was so much in favor of the defendant that I'm going to send it back for a new trial. He didn't do that. Yes, he could have. That would have been within his discretion to do. Was there a motion made on that score? I don't remember. I don't remember if plaintiffs said alternatively send it back for a new trial. I think we moved for judgment. Uh-huh. N.O.B. I mean, J.M.O.L. Yes. Thank you. Thank you very much. Mr. LaGuardia. Yes. Just briefly.  So Judge Lyman, actually on page 47 of his order, talks about the fact that there's enough there's a connection between Antonick's November 6, 2020, email with Kaplan that necessitated the termination. So he does reference that, and actually it says that that could be a contributing factor to her termination. I'm sorry. What page was that? It's on page 47, and it's footnote 17 of the order. I don't have the appendix number. I apologize. 3388. 3388. So it goes into great detail on it. His own belief, based on this, is that there's enough showing that there's this involvement by Antonick and Kaplan. And it's interesting because the jury did send a few notes. One of them was, we know that Kaplan was part of this case. Why isn't he in here? So I think they wanted to find against Kaplan as well, who was, again, involved in this November 6 email. It talks about David asking for this information. And they were the two ones that she was complaining about. And she complained to Pessina and to Antonick. And, Judge Robinson, you had indicated that it was about his conduct, that Antonick knew about his conduct. He knew that he had, based on the inferences that have to be drawn, he knows that he called her the B word, and then acknowledges that. Yeah, I've got to be careful drawing an inference that he knew she made a discrimination claim because he knew he behaved in a way that was discriminatory. That could be a rule that sort of swallows up the. I can understand. I can understand that. I think there is a path through that, though, because the jury could reject that he, in fact, said this word. They acknowledged that. Why do you need that? Why can't you rely on the inference that Pessina told it? Yes. Yeah, I think you can go that way. All I'm saying is that I think there's multiple paths to find knowledge by Antonick, just by his conduct, which he acknowledges. But I think Pessina also, you know, based on her H.R. role, the jury could reasonably infer that she's going to investigate and tell Pessina, tell Antonick, this is what Dr. Edelman said. And I think that's enough. In fact, I know I've mentioned the Quan case a couple of times, but that's a case where the decisionmaker said, they said, oh, we didn't know that she was complaining. And the Court said, look, there's temporal proximity. That's all you need. And it's a de minimis standard. So that's all that's required. It's only that, you know, to Judge Walker, you had talked about how Judge Pessina may have thought this way, and NYU had said they may have thought this way. All that's required, at least at this level of review, is that there's a 1% chance, or even less than that, 0.1% chance, that the jury concluded that Pessina did, in fact, tell Antonick about sex-based complaints. So that's all required, you know, on that front. And I think the jury, the, NYU had also referenced the fact that there was no follow-up by Dr. Edelman in a November email from HR about this complaint. But there was testimony on the record that Dr. Edelman did not see that email. And regardless, at that point, the complaints had been made. Resolution doesn't really matter. It's knowledge that matters. Thank you. If there's nothing further, we'll take your arguments under advisement. Thank you both.  And appreciate it. Thank you.